1   ERIN M. TOBIN (State Bar No. 234943)
    etobin@earthjustice.org
2   MICHAEL R. SHERWOOD (State Bar No. 63702)
    msherwood@earthjustice.org
3   Earthjustice
    426 17th Street
4   Oakland, CA 94612
    (510) 550-6725
5   (510) 550-6749 fax

6   Attorneys for Plaintiff

7

8                   UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF CALIFORNIA
9                     SAN FRANCISCO DIVISION

10

11  CENTER FOR BIOLOGICAL DIVERSITY,     )  Civ. No.
                                         )
12              Plaintiff,               )
                                         )  COMPLAINT FOR DECLARATORY
13      v.                               )  AND INJUNCTIVE RELIEF
                                         )
14  DIRK KEMPTHORNE, in his official capacity )
    as Secretary of the Interior; H. DALE HALL, in )
15  his official capacity as Director, United States )
    Fish and Wildlife Service; and UNITED )
16  STATES FISH AND WILDLIFE SERVICE, an )
    agency of the United States Department of the )
17  Interior,                            )
                                         )
18              Defendants.              )
                                         )
19  _____ )

20                      **INTRODUCTION**

21      1.      This is an action for declaratory and injunctive relief under the Endangered Species

22  Act ("ESA"), 16 U.S.C. §§ 1531- 44, and the Administrative Procedure Act ("APA"), 5 U.S.C. §

23  551, et seq.  Plaintiff Center for Biological Diversity challenges the decision of defendants Dirk

24  Kempthorne, Secretary of the Interior, H. Dale Hall, Director, U.S. Fish and Wildlife Service, and

25  the U.S. Fish and Wildlife Service (collectively "the Service") to eliminate nearly 3.5 million acres

26  of proposed critical habitat for the threatened California red-legged frog (*Rana aurora draytonii*)

27  ("the Frog"), an imperiled subspecies whose geographic range has been drastically curtailed by over

28  seventy percent because of habitat destruction caused by human activities.

2.     Plaintiff seeks a judgment declaring that the Service has violated the ESA and the APA by issuing a critical habitat rule for the Frog that is not based on the best available science, that does not designate as critical habitat all areas that are essential to the conservation of the Frog, and that excludes many thousands of acres by failing to consider all of the conservational, societal, and economic benefits of critical habitat and based upon a faulty economic analysis.  Plaintiff also seeks an order directing the Service to promulgate a new, legally adequate regulation designating critical habitat for the Frog.

## JURISDICTION AND VENUE

3.     The court has jurisdiction over this action by virtue of 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 2201 (declaratory judgment), 28 U.S.C. § 2202 (injunctive relief), 16 U.S.C. § 1540(c) (actions arising under the ESA), and 16 U.S.C. § 1540(g) (citizen suit provision of the ESA).

4.     As required by the ESA, 16 U.S.C. § 1540(g), plaintiff provided sixty days' notice of the violations of the ESA alleged herein on August 28, 2007.  A copy of the notice letter is attached hereto as Exhibit A.

5.     Venue is properly vested in this court pursuant to 16 U.S.C. § 1540(g)(3)(A), as all or part of the violations of the ESA alleged occurred in the Northern District of California, and 28 U.S.C. § 1391(e), as a substantial part of the events and omissions giving rise to the claims occurred in this district.

## INTRADISTRICT ASSIGNMENT

6.     Assignment to the San Francisco Division is proper because the California red-legged Frog is found in counties included within this division, and a substantial part of the events and omissions giving rise to the claims occur in the counties included within this division.  This case is also related to a prior lawsuit involving the Frog's critical habitat, which was resolved by Judge William H. Alsup in the San Francisco Division, *Jumping Frog Research Institute,* et al. *v. Babbitt,* et al., Civ. No. 99-1461(WHA).

**PARTIES**

7.      Plaintiff Center for Biological Diversity ("Center") is a non-profit membership organization based in Tucson, Arizona, with California offices in San Francisco and San Diego.  The Center is dedicated to protecting endangered and threatened species and their habitat in North America through science, policy, education, and environmental law.  The Center pursues its mission by preparing and publishing scientific articles, participating in state and federal administrative proceedings, disseminating educational information through newsletters, alerts, the world-wide web, and media releases, and petitioning and litigating to list numerous birds, fish, amphibians, plants, and insects as threatened or endangered species under the ESA and to designate critical habitat for those species.  The Center's more than 7,000 members and staff include residents who live and work in or near California red-legged frog habitat and who possess educational, scientific, moral, spiritual, and recreational interests in preserving that habitat.

8.      Plaintiff and its members use and enjoy, on an ongoing basis, aquatic ecosystems of the State of California that provide habitat for the Frog, for recreational, scientific, conservational, and aesthetic purposes.  Plaintiff and its members derive or, but for the threatened status of the Frog, would derive recreational, scientific, aesthetic, and conservational benefits from the existence in the wild of California red-legged frogs through wildlife observation, study, photography, and other activities.  The past, present, and future enjoyment of these benefits by plaintiff and its members has been, is being, and will continue to be irreparably harmed by the defendants' failure to designate legally adequate critical habitat for the Frog.

9.      The recreational, scientific, conservational, and aesthetic interests of the Center and its members are actual, concrete injuries suffered by the Center and its members.  They would be redressed by the relief sought herein.  Plaintiff has no adequate remedy at law.

10.      The defendants in this action are:

A.      Dirk Kempthorne, Secretary of the Interior.  As Secretary of the Interior, he has the ultimate responsibility to enforce and implement the provisions of the ESA.  Defendant Kempthorne is sued in his official capacity.

COMPLAINT                                                                                                    3

B.      H. Dale Hall, Director of the U.S. Fish and Wildlife Service.  As the Director, he is the federal official with delegated responsibility for properly enforcing the ESA and the Act's implementing regulations with respect to terrestrial species such as the Frog.  Defendant Hall is sued in his official capacity.

C.      The United States Fish and Wildlife Service.  As an agency within the Department of the Interior, the Service is charged with implementing and ensuring compliance with the ESA.

## STATUTORY BACKGROUND

11.     In enacting the ESA, Congress recognized that habitat loss is "the major cause for the extinction of species worldwide."  H.R. Rep. No. 1625, 95th Cong., 2d Sess. 5, reprinted in 1978 U.S.C.C.A.N. 9453, 9455.  A primary purpose of the ESA is to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved." 16 U.S.C. § 1531(b).

12.     Section 4 of the ESA, and its corresponding regulations, require designation of "critical habitat" for threatened and endangered species at the time of listing, to the maximum extent prudent and determinable.  16 U.S.C. § 1533(a)(3)(A)(i); 50 C.F.R. § 424.12(a).  "Species" includes any subspecies of wildlife, such as the Frog.  16 U.S.C. § 1532(16).

13.     The ESA defines critical habitat as specific areas: (1) within the geographic area occupied by the species at the time it is listed, on which are found those physical or biological features that are "essential to the conservation of the species" and which may require special management consideration or protections, and (2) outside the geographic area occupied by the species at the time it is listed that are "essential for the conservation of the species."  16 U.S.C. § 1532(5)(A)(i), (ii).

14.     The ESA defines "conservation" to mean "the use of all methods . . . that are necessary to bring any . . . threatened species . . . to the point at which the measures provided pursuant to [the Act] are no longer necessary," 16 U.S.C. § 1532(3), *i.e.*, the point at which the species is recovered.  The Ninth Circuit has emphasized that "the purpose of establishing 'critical habitat' is for the government to carve out territory that is not only necessary for the species'

survival but also essential for the species' recovery." *Gifford Pinchot Task Force v. United States Fish & Wildlife Service*, 378 F.3d 1059, 1070 (9th Cir. 2004).

15.    Critical habitat must include "[h]abitats that are protected from disturbance or are representative of the historic geographical and ecological distributions of a species." 50 C.F.R. § 424.12(b)(5).

16.    The Service must make critical habitat determinations "on the basis of the best scientific data available and after taking into consideration the economic impact . . . and any other relevant impact, of specifying any particular area as critical habitat." 16 U.S.C. § 1533(b)(2); 40 C.F.R. § 424.12(a). It is the Service's policy that the best available science upon which critical habitat decisions must be based includes sources such as a species' recovery plan, articles in peer-reviewed journals, conservation plans for the species, scientific status surveys and studies, biological assessments, or other expert opinion.

17.    Once the Service designates critical habitat, the ESA protects that habitat from harm caused by actions by federal agencies. Section 7(a)(2) of the ESA requires that each federal agency "insure" that federal actions will not "result in the destruction or adverse modification" of critical habitat. 16 U.S.C. § 1536(a)(2).

## FACTUAL BACKGROUND

### The California Red-Legged Frog

18.    The California red-legged frog is the largest frog native to the western United States and is characterized by the red or salmon pink coloring of the abdomen and hind legs of adults.

19.    The Frog is a subspecies of the red-legged frog species and is found mainly in California. The habitat range of the Frog historically extended along the California coast from Marin County to northwestern Baja, Mexico, throughout the Central Valley, and within the foothills of the Sierra Nevada. It is typically found from sea level to elevations of approximately 5,000 feet.

20.    The Frog has lost more than seventy percent of its historic range. It has disappeared from 99 percent of its historic range in the Sierra Nevada, and was eliminated from the Central Valley before 1960. Most remaining populations of the Frog are found along the Pacific coast, and there are some pockets of smaller, isolated populations in the Sierra Nevada.

21.    Agriculture, urbanization, water development, placer mining, livestock grazing, logging, road construction, pesticide and chemical use, and the introduction of a variety of non-native predators and competitors have all contributed to widespread habitat alteration that has jeopardized the survival of the Frog.  The fragmentation of existing habitats may represent the most significant current threat to California red-legged frogs.

22.    The Frog is adapted to survive in a Mediterranean climate with variable habitat quality that can influence Frog population sizes.  The Frog is found in ponds, marshes, and creeks with still water, and the subspecies requires riparian areas with dense or shrubby vegetation that contain open areas for basking.  During periods of extended drought, Frogs may temporarily disappear from an area.  This makes it important for the survival and recovery of the subspecies to protect unoccupied sites that can be recolonized by nearby subpopulations.

23.    To reproduce, female adult frogs attach their egg masses to emergent vegetation where the eggs float on the water surface until they hatch.  Because the eggs are exposed and vulnerable, and because the larvae need five to seven months to metamorphose, the survival rate of larvae has been estimated as less than one percent.  It is critical to the Frog's survival, development, and recovery that riparian vegetation is undisturbed.

24.    California red-legged frogs may move from breeding sites at any time of year.  Frogs are capable of dispersing at distances exceeding 1.8 miles from a breeding site and farther than 328 feet from water in adjacent dense riparian vegetation.  There is some evidence that juvenile frogs disperse at least .6 miles away from breeding habitat.

25.    The healthiest California red-legged frog populations persist as a collection of subpopulations that exchange genetic information through individual dispersal events.  These populations persist and grow when there is suitable breeding and nonbreeding habitats interspersed throughout the landscape that are interconnected by unfragmented dispersal habitat.

26.    The survival and recovery of the Frog is dependent upon the protection of existing breeding habitat, the movements of individual frogs between aquatic habitat, and the ability of individual frogs to recolonize unoccupied habitat.  Recolonization of historically occupied but currently unoccupied areas is essential to the recovery of the Frog.

**Administrative and Procedural History**

27.     In 1996, the Service listed the Frog as threatened under the ESA.  61 Fed. Reg. 25813 (May 23, 1996).  In the final rule, the Service noted that urbanization, agriculture, and many other land-disturbing activities have caused substantial changes in the Frog's habitat in California.  The Service acknowledged that preservation and proper management of open space in riparian areas is a "fundamental requirement in the survival and recovery of the California red-legged frog." *Id.* at 25819.  However, the Service did not designate critical habitat for the subspecies because the Service found that designating critical habitat was "not prudent." *Id.* at 25822.

28.     On March 24, 1999, a coalition of conservation organizations including the Center filed a lawsuit in the Northern District of California challenging the Service's failure to designate critical habitat for the Frog.

29.     On December 15, 1999, as clarified by a subsequent order, the district court ordered the Service to issue a final critical habitat rule for the Frog by December 29, 2000.

30.     On September 11, 2000, the Service issued a proposed rule that would designate approximately 5,373,650 acres as critical habitat for the Frog.  65 Fed. Reg. 54892 (September 11, 2000).  On March 13, 2001, the Service published a final rule designating approximately 4.1 million acres of critical habitat for the Frog.  66 Fed. Reg. 14626 (March 13, 2001).

31.     On May 28, 2002, the Service adopted a Recovery Plan for the Frog with the objective of reducing the threats to and improving the population status of the Frog sufficient to delist the subspecies.  According to the Recovery Plan, delisting of the Frog requires protection of existing populations, connectivity between subpopulations, and reestablishment of new populations in certain "core areas" in the Frog's historic range.  The purpose of the core areas is to allow for the long-term viability of existing populations and reestablishment of new populations in the Frog's historic range.

32.     On June 8, 2001, the Home Builders Association of Northern California and other industry groups filed a lawsuit in the U.S. District Court for the District of Columbia challenging the Service's designation of critical habitat for the Frog.  A coalition of conservation organizations including the Center intervened in that lawsuit to defend the critical habitat rule.  However, the

Service reached a closed-door settlement with the industry groups and agreed to vacate the critical habitat designation and remand it to the Service to do over with a new economic analysis. The settlement allowed two areas (that were not occupied by the Frog) to retain their status as critical habitat, in Tuolumne, Mariposa and Los Angeles Counties. The settlement was adopted by the court over the objections of the Center as a consent decree on November 6, 2002.

33.    On April 13, 2004, the Service published a proposed revised critical habitat rule designating approximately 4.1 million acres as critical habitat for the Frog. 69 Fed. Reg. 19620 (April, 13, 2004) ("proposed rule"). The proposed rule proposed designating as critical habitat areas essential to the Frog's conservation, including essential aquatic habitat for feeding and breeding, associated uplands, and dispersal habitat to allow frogs to move between and among essential aquatic habitat. The proposed rule would have designated both areas that were occupied by the Frog and areas not occupied by the Frog. The Service concluded that the unoccupied areas proposed for designation as critical habitat are essential to the Frog's conservation because they are within the "core areas" identified in the Frog's Recovery Plan, represent the Frog's historic range, and have "unique ecological significance" for the subspecies.

34.    On November 3, 2005, the Service published a revised proposed revised critical habitat rule. 70 Fed. Reg. 66906 (Nov. 3, 2005) ("revised proposed rule"). The revised proposed rule proposed to designate approximately 737,912 acres of critical habitat. As compared to the pre-existing rule and the April 2004 proposed rule, each of which would designate approximately 4.1 million acres of critical habitat, this represented a substantial reduction in critical habitat for the Frog. The revised proposed rule eliminated all areas that were not currently occupied by the Frog, even though the Service had determined in the proposed rule that at least two such unoccupied areas are "essential" to the conservation of the Frog.

35.    On April 13, 2006, the Service published a final revised rule designating critical habitat for the Frog that reduced the Frog's critical habitat even further, to approximately 450,288 acres. 71 Fed. Reg. 19244 (April 13, 2006) ("final critical habitat rule" or "final rule"). This was nearly a ninety percent reduction in overall critical habitat for the Frog as compared to the pre-existing rule and the April 2004 proposed rule.

36.    The final critical habitat rule does not designate as critical habitat any areas that are not currently occupied by the Frog, even though the Frog's geographic range has dwindled to less than a third of the subspecies' historic range.  The final rule does not explain why the Service decided it would not designate historically occupied but currently unoccupied areas as critical habitat when both the Service's April 2004 proposed rule and the Recovery Plan determine that some unoccupied areas are essential to the Frog's conservation.

37.    The final rule excludes from the Frog's critical habitat federal lands within Sierra Nevada national forests, and areas covered by habitat conservation plans and other management plans, by consistently overstating the costs and failing to recognize the conservation, societal, and economic benefits of designating Frog critical habitat.

38.    The final critical habitat rule excludes over 200,000 acres based on an economic analysis that does not meaningfully consider nor analyze all of the likely benefits of designating such areas as critical habitat for the Frog.

39.    Benefits of designating critical habitat ignored by the Service in the final rule include, but are not limited to, protection of ecosystem functions such as water filtration, erosion control, and climate and air quality control.  Although members of the public repeatedly informed the Service of this error in public comments on the proposed rule, the Service did not consider many such benefits because the Service found that it was too "difficult" to estimate their value.  The Service also did not evaluate broader social values of designating critical habitat such as the value of preserving the genetic and scientific resources of plants and animals protected by critical habitat, or the aesthetic, cultural, and historic values of preserving critical habitat.

**Political Interference In The Rule-Making Process**

40.    The Service's determination in the final critical habitat rule that over 3.5 million acres is not Frog "critical habitat" is a direct result of pressure by the Interior Department, in particular by former Deputy Assistant Secretary Julie MacDonald, to reduce protections for the Frog for the benefit of private landowners, the livestock industry, and other special-interest groups, at the expense of the scientific integrity of the final rule.

1    41.    After publication of the proposed critical habitat rule in April 2004, Service field

2    offices were informed that officials in the Interior Department in Washington, D.C. wanted the

3    Service to re-propose the Frog's critical habitat rule in order to reduce the potential economic effect

4    of the rule on industry groups.  Instructions came directly from former Deputy Assistant Secretary

5    for Fish, Wildlife, and Parks, Julie MacDonald, a non-biologist and political appointee, that it was

6    necessary to designate the smallest possible critical habitat for the Frog.  Field offices were told that

7    designating as critical habitat areas that were not currently occupied by the Frog would be "very

8    difficult," and that Service biologists could not rely on the Frog's Recovery Plan to determine that

9    unoccupied areas were essential to the conservation of the Frog and, hence, critical habitat.

10    42.    Former Deputy Assistant Secretary MacDonald is not a trained biologist.  Ms.

11    MacDonald nevertheless had numerous briefings with professional staff in the Service's California-

12    Nevada Operations Office and California field offices who were handling the critical habitat rule.  In

13    some of these briefings, Ms. MacDonald gave staff direction as to how to map habitat of the Frog.

14    Ms. MacDonald also made clear her concern that staff were proposing to designate too much

15    unoccupied habitat as critical habitat for the Frog.  Ms. MacDonald also reviewed, commented, and

16    edited in detail drafts of the critical habitat rule, and repeatedly questioned scientific judgments and

17    interpretation of scientific literature that would increase protections for the Frog and potentially

18    adversely impact industry groups.

19    43.    A documented history exists within the Interior Department of interference by

20    political appointees with scientific decision-making in the Endangered Species Program.  Such

21    interference has compromised the scientific integrity of the Service's endangered and threatened

22    species listing and critical habitat decisions, including the final critical habitat rule for the Frog.

23    44.    On April 11, 2006, an employee of the Service filed a complaint with the Interior

24    Department's Inspector General that former Deputy Assistant Secretary MacDonald had "bullied,

25    harassed, and insulted" professional staff of the Service to coerce staff to ignore scientific

26    information and change scientific documents related to the Service's Endangered Species Program.

27    The Inspector General initiated an investigation of Ms. MacDonald's inappropriate involvement in

28    species listing and critical habitat decisions.

45. The scientific integrity of numerous species decisions has been called into doubt as a result of former Deputy Assistant Secretary MacDonald's unmatched and aggressive involvement in reshaping endangered species scientific reports at the field level. Ms. MacDonald has interfered with critical habitat fieldwork, ordered that staff change scientific documents, and insisted that field scientists revise their scientific findings to be consistent with Ms. MacDonald's inexpert interpretations of the scientific literature. Examples of this behavior are reflected in the Inspector General's final report of its investigation of Ms. MacDonald, which it published in March 2007.

46. On or around May 1, 2007, Ms. MacDonald resigned as Deputy Assistant Secretary of the Interior for Fish, Wildlife, and Parks.

47. On or around June 29, 2007, the Manager of the Service's California-Nevada Operations Office informed the Director of the Service that on "multiple occasions" former Deputy Assistant Secretary MacDonald "did actively attempt to influence [the] scientific rationale and conclusions" for species decisions. The California-Nevada Operations Office further recommended that the Service revise the Frog's critical habitat because MacDonald "influenced the application of science" in the final rule. *See* June 29, 2007 letter from Manager Steve Thompson to Director H. Dale Hall, attached hereto as Exhibit B.

48. On or around July 20, 2007, Director H. Dale Hall ordered a review of the listing and critical habitat decisions for eight species, including the Frog's critical habitat rule, because the decisions may have been inappropriately influenced by former Deputy Assistant Secretary MacDonald.

49. On or around November 23, 2007, the Service determined that the Frog's critical habitat rule "should be revised" because of valid questions concerning the scientific integrity of the final rule and whether the rule applied the appropriate legal standards. *See* November 23, 2007 letter from Acting Director Kenneth Stansell to Representative Nick J. Rahall, II, attached hereto as Exhibit C. However, the Service stated that it would only proceed with this revision "as funding is made available." *Id.*

1

## CLAIMS FOR RELIEF

2

### FIRST CLAIM FOR RELIEF

3

### (Violation of the Endangered Species Act)

4       50.    Plaintiff realleges, as if fully set forth herein, each and every allegation contained in

5    the preceding paragraphs.

6       51.    Section 4(b)(2) of the ESA imposes a non-discretionary duty on the Service to

7    designate critical habitat for all listed species and subspecies, including the Frog, "on the basis of the

8    best scientific data available."  16 U.S.C. § 1533(b)(2).

9       52.    Because the Interior Department improperly interfered with scientific determinations

10   forming the basis of the Frog's critical habitat designation, and for the reasons set forth above, the

11   final critical habitat rule is not based on the "best scientific data available," in violation of Section

12   4(b)(2) of the ESA, 16 U.S.C. § 1533(b)(2).

13      53.    This violation of a non-discretionary duty is subject to judicial review under the ESA,

14   16 U.S.C. § 1540(g).

15

### SECOND CLAIM FOR RELIEF

16

### (Violation of the Endangered Species Act)

17      54.    Plaintiff realleges, as if fully set forth herein, each and every allegation contained in

18   the preceding paragraphs.

19      55.    Section 4(b)(2) of the ESA imposes a non-discretionary duty on the Service to

20   designate critical habitat for all listed species, including the Frog, after taking into consideration the

21   economic impact and "any other relevant impact" of specifying a particular area as critical habitat.

22   16 U.S.C. § 1533(b)(2).  The Secretary may exclude an area from critical habitat only if he or she

23   "determines that the benefits of such exclusion outweigh the benefits of specifying such area as part

24   of the critical habitat."  16 U.S.C. § 1533(b)(2).

25      56.    The final critical habitat rule excludes from the Frog's critical habitat areas within

26   Sierra Nevada national forests, areas covered by habitat conservation plans and State and local

27   management plans, and other areas, based on the Service's arbitrary assessment of the benefits and

28   costs of designating these areas as critical habitat, the agency's failure to recognize the conservation

and societal benefits of critical habitat, and a faulty economic analysis that inflates the overall costs and fails to recognize the economic benefits of designating critical habitat for the Frog, in violation of Section 4(b)(2) of the ESA, 16 U.S.C. § 1533(b)(2).

57.    This violation of a non-discretionary duty is subject to judicial review under the ESA, 16 U.S.C. § 1540(g).

### THIRD CLAIM FOR RELIEF

### (Violation of the Endangered Species Act)

58.    Plaintiff realleges, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

59.    Section 4(a)(3) of the ESA imposes a non-discretionary duty on the Service to designate as critical habitat for the Frog all areas that are essential to the survival, recovery, and conservation of the Frog.  16 U.S.C. § 1533(a)(3); 16 U.S.C. § 1532(5)(A)(i), (ii).

60.    For the reasons set forth above, the Service failed to include in the final critical habitat rule areas that are essential to the survival, recovery, and conservation of the Frog, in violation of Section 4(a)(3) of the ESA, 16 U.S.C. § 1533(a)(3).

61.    This violation of a non-discretionary duty is subject to judicial review under the ESA, 16 U.S.C. § 1540(g).

### FOURTH CLAIM FOR RELIEF

### (Violations of the Administrative Procedure Act)

62.    Plaintiff realleges, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

63.    The Service's adoption of the final critical habitat rule is a final agency action subject to judicial review under the APA.

64.    The Service's failure in the final critical habitat rule to make its determination of the Frog's critical habitat on the basis of the best scientific data available, its failure to designate as critical habitat all areas that are essential to the conservation of the Frog, and its exclusion of areas under Section 4(b)(2) and in reliance on a faulty economic analysis, are each and all arbitrary, capricious, an abuse of discretion, otherwise not in accordance with the law, in excess of statutory

authority, and without observance of procedure required by law, in violation of the APA, 5 U.S.C. § 706(2).

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiff respectfully requests that the Court:

A.      Find and declare that the Service violated the ESA, its implementing regulations, and the APA in designating critical habitat for the Frog;

B.      Order the Service to designate critical habitat for the Frog that includes all habitat that, on the basis of the best available scientific data, is essential to the survival and recovery of the Frog, properly considers the benefits and costs of critical habitat designation, and is otherwise in compliance with the ESA and its implementing regulations;

C.      Order the Service to initiate a new rulemaking procedure immediately, and to publish a proposed revised designation of critical habitat for the Frog within ninety days after the Order of this Court, and to publish a final rule designating legally adequate critical habitat for the Frog within nine months thereafter;

D.      Retain jurisdiction over this matter until such time as the Service has published a final rule designating legally adequate critical habitat for the Frog;

D.      Award plaintiff its reasonable fees, costs, expenses, and disbursements, including attorneys fees, associated with this litigation.

E.      Grant plaintiff such additional and further relief as the Court may deem just and appropriate.

DATED: December _19_, 2007.          Respectfully submitted,

                                    _Erin M. Tobin_

                                    ERIN M. TOBIN (State Bar No. 234943)
                                    MICHAEL R. SHERWOOD (State Bar No. 63702)
                                    Earthjustice
                                    426 17th Street
                                    Oakland, CA  94612
                                    (510) 550-6725
                                    (510) 550-6749 fax

                                    Attorneys for Plaintiff

COMPLAINT                                                                      14

Exhibit A

 CENTER *for* BIOLOGICAL DIVERSITY                    *Because life is good.*

August 28, 2007

Honorable Dirk Kempthorne
Secretary, U.S. Department of the Interior
1849 C Street, NW
Washington, DC 20240

Honorable Dale Hall
Director, U.S. Fish and Wildlife Service
1849 C Street, NW
Washington, DC 20240

Re:    Notice of Violations of Law under the Endangered Species Act (ESA), and Allegations of
Persistent Pattern and Practice Problems under Section 4 of the ESA

Dear Secretary Kempthorne and Director Hall:

On behalf of the Center for Biological Diversity and our 80,000 members and activist supporters,
and pursuant to Section 11(g) of the ESA, we hereby provide you formal notice that the
Department of Interior (DOI) and the U.S. Fish and Wildlife Service (USFWS) have violated the
listing and critical habitat provisions of the Endangered Species Act for 55 species.

The violations all stem from the overruling of USFWS scientists by high ranking bureaucrats in
the White House Office of Budget and Management, the Department Interior, and the Fish and
Wildlife Service. Many of the decisions are directly traceable to Deputy Assistant Secretary of
Interior Julie MacDonald. Others were committed by Randal Bowman, Special Assistant to the
Assistant Secretary of Interior, and Craig Manson, the Assistant Secretary of Interior himself.
Still others were committed by Ruth Solomon in the White House Office of Management and
Budget. Clearly the number of endangered species harmed by the Bush administration's
concerted efforts to squelch scientific decision-making far exceeds the eight decision cynically
identified by USFWS Chief Dale Hall last month. And the corruption which promoted the illegal
actions goes far deeper the Julie MacDonald.

This notice letter supplements any previous or future notice letters pertaining to the threatened
and endangered species discussed below, and incorporates by reference all earlier notices
involving these species.

## FOUR LISTING DECISIONS

### *Sacramento Splittail (Pogonichthys macrolepidotus)*
The Sacramento splittail was proposed to be listed in 1993 and was listed in 1999 (64 Fed. Reg.
05963). After litigation by state industrial water authorities, the final listing rule was remanded

back to the agencies in 2000, with an order to re-evaluate the decision.  On September 22, 2003 (68 Fed. Reg. 55140), the U.S. Fish and Wildlife Service issued a decision to remove the splittail from the endangered species list despite a strong scientific consensus by scientists within the agency to retain its protected status. The overruling of the scientists was ordered by Deputy Assistant Secretary of Interior Julie MacDonald and Steve Thompson, head of the U.S Fish and Wildlife Service Sacramento Office. The decision expressly ignored the most recent population trend studies which supported the scientific consensus. The decision to remove the splittail violated the best available scientific information standard and was arbitrary and capricious.

**Montana Fluvial Arctic Grayling (Thymallus arcticus)**
The Montana fluvial arctic grayling (Thymallus arcticus) was once widely distributed throughout the upper Missouri River drainage above Great Falls, MT. Today, only one population remains in the upper Big Hole River in southwestern Montana, inhabiting approximately 5% of its historical range.  The decline of the grayling was caused by livestock grazing and stream dewatering, climate change, and competition with and predation by nonnative species.  In response to a 1991 petition, the USFWS concluded that the grayling warranted Endangered Species Act listing in 1994 and in each subsequent year through 2006. In 2004 the species priority status was elevated from a 9 to a 3—the highest priority possible for a population, indicating imminent risk of extinction and a high degree of threat. In response to a lawsuit challenging the agency's excessive delay in issuing a listing decision, the USFWS made a final decision on April 24, 2007. 72 Fed. Reg. 20305. Scientists within the agency drafted a proposal to list the grayling, but were overruled by Deputy Assistant Secretary of Interior Julie MacDonald. That decision contradicted the best available scientific information in violation of the Endangered Species Act.

*Mexican Garter Snake (Thamnophis eques megalops)*
On September 26, 2006, the USFWS issued a "not warranted" 12-month finding on petition to list the Mexican garter snake as an endangered species in Arizona and New Mexico. The decision was ordered by Julie MacDonald over the objections of USFWS scientists. Approximately 90% of the garter snake's habitat has already been lost and what remains continues to degrade on both sides of the border. The final decision was based upon conclusions contradicted by the agency record that, i) the U.S. population of this species is not a distinct population segment; ii) the species is not threatened or endangered throughout a significant portion of its range; and iii) the species is not threatened or endangered throughout its range.  All three conclusions are arbitrary, capricious and otherwise contrary to law.  The best scientific and commercial data available indicates this species should be listed under the ESA.

*Tabernaemontana Rotensis*
A proposed rule, to list this plant as an endangered species on the islands of Rota and Guam, was issued on June 1, 2000 (65 Fed. Reg. 25025).  On April 8, 2004 (69 Fed. Reg. 18499) the decision was withdrawn based on the assertion that *Tabernaemontana rotensis* is not a valid species. This conclusion by Randal Bowman, Special Assistant to the Assistant Secretary for Fish, Wildlife and Parks, was contradicted by the scientific consensus of USFWS scientists and the scientific peer reviewers who reviewed the proposed listing rule. Despite pressure from

Bowman, scientists in the Honolulu office of the USFWS courageously held fast to, and amply documented the fact the best available scientific information supported the taxonomic status of *T. rotensis*. When they strengthened the taxonomic analysis instead of recanting it, the listing decision was moved to Washington, D.C. where the scientific analysis was deleted and replaced with a cursory and contradictory conclusion. The refusal to list *Tabernaemontana rotensis* as endangered was arbitrary, capricious, and in contradiction to the best available scientific information.

## SEVEN FIVE-YEAR REVIEWS

Section 4(c)(2) of the Endangered Species Act requires the Secretary to determine at five year intervals whether listed species should be reclassified or delisted.  Though five-year reviews do not in themselves change the status of listed species or require the changing of such status, they do result in a "determination" by the Secretary in accordance with Section 4(a) and 4(b). The determinations are thus reviewable by federal courts under 4(a) and 4(b) standards, including the requirement to solely base determinations on the best available scientific and commercial information. The USFWS has issued a series of five-year reviews in recent months which clearly contradict the best available scientific information in order to justify determinations that species be downlisted or delisted. Many, if not all, of these determinations were ordered by bureaucrats in the USFWS and/or DOI over the objection of agency scientists and outside experts.

*Marbled Murrelet (Brachyramphus marmoratus)*
On August 31, 2004, the USFWS issued a five-year review for the California, Oregon, and Washington distinct population segment of the marbled murrelet. USFWS scientists and an independent contractor hired by the USFWS concluded that the murrelet is a valid distinct population segment, is threatened with extinction, and therefore should retain its current status as a threatened species. The scientists and contractor concluded that use of the international border to demarcate the population was justified due to differences in management between the United States and Canada. This decision arbitrarily and capriciously overturned by former Assistant Secretary Craig Manson and Deputy Assistant Secretary Julie MacDonald. They altered the analysis to wrongfully assert that there are no significant differences between Canadian and U.S. management and that the California, Oregon, Washington birds do not qualify as distinct population segment.

*California Least Tern (Sterna antillarum browni)*
On September 26, 2006, the USFWS issued a five-year review determining that the California least tern should be downlisted from endangered to threatened. This determination arbitrarily and capriciously overturned the conclusion of the USFWS scientist who prepared the draft five-year review. That scientist concluded that the tern should retain its endangered species because the species has not met the downlisting requirements of its federal recovery plan, is threatened by global warming, has low reproductive success rates, and is not adequately protected by habitat and predator control agreements. Without explanation, the final 5-year review deleted all references to global warming and misleadingly downplayed other threats to the species. On

August 23, 2006, the lead USFWS biologist wrote a letter to his superiors complaining that the conclusions and logic of the five-year review had been changes due to "political rationales".

### Caribbean Brown Pelican (Pelecanus occidentalis occidentalis)

The Caribbean brown pelican recovery plan establish a recovery criteria of 1) a five-year observed mean level of 2,300 individuals during winter in Puerto Rico and the American Virgin Islands, and 2) a five-year observed mean level of 350 breeding pairs at the peak of the breeding season in the same areas. These targets may have been met in the early 1980s, but not since. Winter counts between 1992 and 195 averaged only 593 birds. Despite the clearly failure to meet federal recovery objectives and the apparent decline in recent decades,  the USFWS completed a five-year review on February 7, 2007, which determined that the Caribbean brown pelican is neither threatened nor endangered, and is a portion of an invalid distinct population segment and thus should be delisted.

Since the USFWS recognizes P. o. occidentalis is a valid, listed subspecies, it may not delist the subspecies unless it is no longer threatened or endangered. Whether it also belongs to a larger distinct population segment is irrelevant since the Endangered Species Act requires the conservation of the smaller subspecies. The five-year review, however, contains no analysis of whether the subspecies is threatened or endangered in all or a substantial portion of its range.

The five-year review does not assert that the recovery criteria in the federal recovery plan are inadequate and does not explain why it is declaring the subspecies recovered despite the failure to attain the criteria. It speculates that the population may not have actually declined, but provides absolutely no evidence that this is actually the case.

For the reasons stated above, the determination is arbitrary and capricious and violation of the Endangered Species Act's best available scientific information standard.

### Eastern Brown Pelican (Pelecanus occidentalis occidentalis)

The eastern brown pelican is delisted on the Atlantic coast and the Gulf Coast east of Louisiana. It remains listed as an endangered species in Texas and Louisiana. On February 7, 2007, the USFWS completed a five-year review determining that the Texas and Louisiana populations are recovered and are a portion of an invalid distinct population segment. The validity of the population segment, however, is irrelevant to whether the valid subspecies-P. o. occidentalis-is threatened or endangered in a significant portion of its range. The five-year review does not make such a finding for the subspecies, thus it determination is arbitrary and capricious.

The five-year review's failure to adequately assess the past and likely future impacts of global warming is fatal flaw rendering its determination arbitrary and capricious. The review states with great confidence:

> "In the absence of other pressures on the pelican population, such as increased pollution, fishing pressures, or long-term environmental changes (i.e. climate change) that result in long-term unfavorable conditions for anchovies and other prey, natural factors are not likely to

threaten the subspecies…In summary, natural factors may adversely affect brown pelicans on a short-term, localized basis, but in and of themselves, pose no threat to the continued existence of the species. The pelican is a long-lived species that has evolved with natural phenomena such as winter storms and hurricanes. These factors are only significant when population sizes are small and reproduction is limited. Because current populations are large and reproduction has been restored to a level that can compensate for normal environmental fluctuations, these factors no longer pose a significant threat to the species."

The State of Louisiana, however, has expressed great concern about the impact of past and future hurricanes on brown pelican recovery:

Hurricanes Katrina and Rita "severely impacted productivity and caused catastrophic damage to brown pelican nesting colonies east of the Mississippi River and reduced land mass and degraded vegetative habitat west of the Mississippi River. Amy Sallenger, a U.S. Geological Survey (USGS) oceanographer, reported on the Chandeleur Islands in a March 14, 2006 Associated Press article that 'USGS surveys before Katrina showed that islands rose up to 18 feet above sea level. After the storm, 90 percent of land disappeared and no place had an elevation above 6 feet.' High spring tides in May 2006 and Tropical Storm Alberto in June 2006 caused nest flooding and reduced productivity east of the Mississippi River. Approximately 17,516 fledglings were produced; compared to 25,289 the previous year. The loss of barrier islands, nesting colonies, and the erosion and degradation of nesting islands in coastal Louisiana by tropical storms and hurricanes could have long term negative impacts on Louisiana's brown pelican population." (Louisiana Department of Wildlife and Fisheries. 2007. Louisiana Department of Wildlife and Fisheries 2005-2006 Annual Report)



Between 2005 and 2006, the number of active nests in the state plunged over 50% from about 17,000 to 8,036. The USFWS's blithe and unsubstantiated dismissal of the long-term impacts of recent and likely future hurricanes is arbitrary and capricious. A scientifically valid determination of the status of the species, subspecies, or any distinct population segments can not be made without a substantial review of the long-term effects of hurricanes, sea-level rise, and oil spills.

*West Virginia Northern Flying Squirrel (Glaucomys sabrinus fuscus)*
On April 15, 2006, the USFWS issued an arbitrary and capricious five-year review determining that the endangered West Virginia northern flying squirrel is recovered and should be removed from the endangered species list. The review states that the species population increased substantially since 1985 when it was placed on the endangered species list. This conclusion is unwarranted because the USFWS possesses no population size or trend data. The review references scientific studies indicating that the species preferred habitat-mature red spruce forest-is projected to entirely disappear from the United States due to global warming, then arbitrarily declares that the habitat loss is unforeseeable even though scientists have clearly foreseen it. No explanation is given at to why the impact is unforeseeable. The determination contradicts the recovery criteria established by the federal recovery plan which was authorized in 1985 and updated in 2001. No rational explanation is given for why the recovery plan objectives are no longer valid.

*Florida Manatee (Trichechus manatus latirostris)*
A panel of six scientist convened by the USFWS to develop the third revised recovery plan for the Florida manatee divided the subspecies into four management units: Northwest, Southwest, Atlantic and Upper St. Johns River. In order to downlist the species from endangered to threatened, the scientist concluded that over a twenty year period, each unit must meet the following criteria within a 95 percent confidence interval: the annual adult survival rate must be at least 94 percent, at least 40 percent of adult females must calve annually, and the total population must have grown by four percent per year. These downlisting criteria were arbitrarily and capriciously overturned by USFWS and DOI bureaucrats who were not members of the recovery team. Under their direction, the final recovery plan revision reduced the adult survival rate to 90%, reduced the population growth rate to zero or more percent, and eliminated the confidence level. The unjustified and unjustifiable change violates the best available science standard and thus is arbitrary and capricious.

On April 6, 2007, the USFWS issued an arbitrary and capricious five-year review determining that the Florida manatee should be downlisted from endangered to threatened. The manatee has not met the downlisting criteria established by either the scientists on the recovery team or even the watered down final revised recovery plan. The USFWS attempted to justify ignoring the plan by asserting that its decision was based on computer model of the species population viability. The model, however, is not a substitute for recovery criteria. And even the model indicates a significant likelihood that the subspecies will decline to an extinction threshold within 100 years.

*Antillean Manatee (Trichechus manatus manatus)*
On April 6, 2007, the USFWS issued an arbitrary and capricious five-year review determining that the Antillean manatee should be downlisted from endangered to threatened. The determination was made despite the fact that the agency has not yet established objective downlisting criteria as required by the Endangered Species Act, does not know the current population size, and does not know whether the species has increased, decreased, or remained stable since being listed as an endangered species in 1967. Due to its own failure to develop and fund statistically sound population surveys and establish scientifically rigorous recovery criteria,

it has no basis upon with make a determination that the subspecies is not longer an endangered species.

## 44 CRITICAL HABITAT DECISIONS

### Topeka Shiner (Notropis topeka) Critical Habitat

The Topeka shiner was listed in 1998 and still, tragically, does not possess a final recovery plan. The proposed critical habitat designation sought to protect 90,073 acres of habitat along 2,447 miles of river, while the final rule protected only 30,400 acres along 836 river miles. Fed. Reg. 44735 (July 27, 2004). The final rule excluded all of Missouri, Kansas and South Dakota. The dramatic 66% reduction was largely based on an illegal order by Ruth Solomon, Interior Department Desk Officer within the White House Office of Management and Budget to delete the economic benefits analysis of the critical habitat designation and replace it with a false statement the economic benefits were not and could not be considered. The designation also illegally relied draft conservation plans the USFWS knew were not being implemented and have not been fully implemented to this day. Finally, the Section 4(b)(2) exclusion exaggerated the costs and purposefully underestimated the benefits, rendering the exclusions arbitrary and capricious.

### Southwestern Willow Flycatcher (Empidonax traillii extimus) Critical Habitat

The final revised critical habitat rule for this riparian-dependant species, whose range includes arid ecosystems in California, Arizona, New Mexico, Utah, Nevada, Colorado and Texas, was published in 70 Fed. Reg. 60885 (October 19, 2005). This final rule consisted of 120,824 protected acres while the proposed rule had included 376,095 acres of critical habitat.   As the USFWS has already conceded to some degree, Julie MacDonald inappropriately overruled agency biologists seeking to utilize the best scientific data available for this species' critical habitat.   Further, the critical habitat definition in the final rule unlawfully contradicts and excludes, without any rational explanation, the habitat "essential to the conservation" of this species as defined by its 2002 recovery plan. See 16 U.S.C. Sec. 1532(5) (definition of critical habitat).   This final rule in question also illegally fails to consider economic benefits of critical habitat for this migratory bird species, rendering the Section 4(b)(2) exclusion arbitrary and capricious.

### Loach Minnow (Rhinichthys cobitis) Critical Habitat

The final revised critical habitat rule for this desert fish species, whose range includes Arizona and New Mexico, was published at 72 Fed. Reg. 13355 (March 21, 2007).  Although the first revised proposed rule sought to protect 898 rive miles and the second revised proposed rule sought to protect 474.1 river miles, the final rule protects only 426.7 river miles. Julie MacDonald overruled staff scientists in disregard of the "best available science" standard on the revised final rule. Unfortunately, Director Hall has not conceded MacDonald's nefarious influence over this species' conservation.  Further, like the willow flycatcher case, the definition of "essential to the conservation" of the species illegally contradicts the species' recovery plan without rational explanation.  The loach minnow final rule for critical habitat also exaggerates

the costs of protecting river habitat while underestimating the benefit, rendering the Section 4(b)(2) exclusion arbitrary and capricious.

### Spikedace (Meda fulgida) Critical Habitat
The final revised critical habitat rule for this desert fish species, whose range includes Arizona and New Mexico, was published in 72 Fed. Reg. 13355 (March 21, 2007) along with the loach minnow rule, supra.  In a recurring pattern, this final rule protects far fewer river miles (259.9 miles) than both the 1st revised draft rule (807 miles) and the 2nd draft revised rule (375.9 miles). Julie MacDonald overruled agency scientists in violation of Section 4's best available science standard. The final critical habitat rule disregarded the definition of habitat "essential to the conservation" of the species in the recovery plan, and the final rule exaggerates costs under Section 4(b)(2) by, inter alia, failing to accurately calculate and account for benefits of critical habitat.  In addition, this final rule in question illegally defines "occupied" habitat under 16 U.S.C. Sec. 1532(5).

### California Red-Legged Frog(Rana aurora draytonii )Critical Habitat
This final revised critical habitat rule for this famous amphibian was published in 71 Fed. Reg. 19243 (April 13, 2006).  As with the willow flycatcher example, though the USFWS has conceded improper Julie MacDonald meddling with the best available science for this species, it has not acknowledged the troubling political interference that has brought harm to this species since at least 2001.  The 450,288 acres protected by the revised final rule pales in comparison to the 4,138,064 acres in the first revised final proposal and the 737,912 in the first revised re-proposed rule.  And, in an all too familiar refrain, your agencies have illegally disregarded the Section 4 scientific standard for this frog, ignored the "essential to the conservation" prescription in the species recovery plan, and inflated the costs of critical habitat in many ways including failure to properly assess benefits.

### Santa Ana Sucker (Catostomus santaanae) Critical Habitat
The revised critical habitat rule for this species was issued on January 4, 2005 (70 Fed. Reg. 425).  75% of the sucker's range has already been lost.  However, the revised critical habitat final rule removed 12,824 acres and several critical habitat units from the previous final rule (constituting a 60% reduction in critical habitat protection), allegedly the result of political interference from the Assistant Secretary's Office.  At least 15,414 acres of habitat have been determined by the USFWS to be "essential to the conservation" of this species, but your agencies have unlawfully determined that other so-called habitat conservation plans (under Section 10 of the ESA) satisfy the critical habitat requirement.  The revised final rule in question also arbitrarily and capriciously undervalued benefits of critical habitat, overvalued costs, and thus unlawfully excluded critical habitat pursuant to Section 4(b)(2) of the ESA.   Further, the revised final rule illegally defined "occupied" and "unoccupied" habitat pursuant to Section 3(5) of the ESA.

### Arroyo Toad (Bufo californicus) Critical Habitat
This amphibian, native to coastal central and southern California, lost three-quarters of its historic range by 1994, thirteen years ago.  A variety of threats, including those related to habitat

degradation and destruction, continue to imperil this species. The final revised critical habitat rule in question was finalize on April 13, 2005 (70 Fed. Reg. 19562), and totaled 11,695 acres of protection. This miniscule amount pales in comparison to the previous final and proposed designations of 182,360 and 138,713 respectively. The amount is also a small fraction of the 104,699 acres identified by the agency as "essential to the conservation of the species." Numerous legal defects plague the final rule in question, many seen in other critical habitat designations: i) arbitrary identification of costs and benefits of critical habitat; ii) illegal exclusions pertaining to Section 4(b); iii) public participation irregularities and violations; iv) unsupported definitions of "occupied" and "unoccupied" habitat; and v) unlawful use of other plans to satisfy critical habitat obligations.

### Western Snowy Plover (Charadrius alexandrinus nivosus) Critical Habitat
This species was listed in 1993 and still, even more ridiculously, does not possess a final recovery plan. The final critical habitat rule in question, 70 Fed. Reg. 56969 (September 29, 2005), is illegal for several recurring reasons. First, it fails to adequately assess and utilize economic benefits of critical habitat for this coastal bird species, thus rendering the Section 4(b)(2) exclusion illegal. Second, it arbitrarily and improperly ignored the economic analysis performed by the USFWS field offices in question. Third, it failed to rationally explain how the final protected acreage of 12,145 acres can adequately conserve this species in light of previous rules that protected 20,000 acres and 17,299 acres respectively.

### Gila Chub (Gila intermedia) Critical Habitat
The final rule in question for this fish species was finalized on November 2, 2005 (70 Fed. Reg. 66663). While the proposed rule had sought to protect 33,280 acres, the final rule reduced this to 25,600 acres. The so-called economic and partnership costs estimate associated with the final rule contradicts the conclusion of agency experts that the actions supposedly driving the estimate are very unlikely to occur, thus the Section 4(b)(2) analysis and exclusion was arbitrary and capricious. Political interference with the economic cost analysis also improperly attributed costs to this species' critical habitat that are known to be caused by events and species other than the Gila chub and other than Gila chub critical habitat, again rendering the Section 4(b)(2) analysis and exclusion arbitrary and capricious. The Fish and Wildlife Service also never developed a concept of what a "recovered" Gila chub would look like, thus rendering its conclusion that certain areas are necessary for conservation, while others are not, arbitrary and capricious.

### Buena Vista Lake Ornate Shrew (Sorex ornatus relictus) Critical Habitat
Although the proposed rule for this California species sought to protect 4,650 acres, the final rule was reduced to a piddling 84 acres. 70 Fed. Reg. 3438 (January 24, 2005). The final rule possesses no relationship to the recovery plan and did not identify all areas essential to the conservation of this species. Further, the Section 4(b)(2) exclusion was based on speculative and exaggerated costs, a refusal to acknowledge benefits, as well as false and irrelevant assertions about the benefit of alternative management plan. This final rule is illegal.

### Alameda Whipsnake (Masticophis lateralis euryxanthus) Critical Habitat

The final revised rule for this species dramatically reduced earlier final and proposed rules to protect critical habitat.  71 Fed. Reg. 58175 (October 2, 2006).   Whereas earlier rules protected over 400,000 and 200,000 acres respectively, the final revised rule in questions protects merely 154,834 acres.   This final revised critical habitat rule does not identify all areas essential to the conservation of the species.  The Section 4(b)(2) exclusion relies on speculation and draft plans to exaggerate costs of the designation, and fails to properly identify economic and other benefits. The final rule is, thus, unlawful.

### Arkansas River Shiner (Notropis girardi) Critical Habitat
The final revised critical habitat for the Arkansas river shiner was reduced to 85,120 acres on 532 river miles from the 199,040 acres on 1,244 river miles in the proposed revision. 70 Fed. Reg. 59807 (October 13, 2005).  This final revision eliminated all proposed river segments in New Mexico and Texas. It does not identify all areas essential to the conservation of the species. The Section 4(b)(2) exclusion and analysis relies on speculation to exaggerate costs of the designation, and fails to properly identify economic and other benefits.  The final rule is, thus, unlawful.

### Peck's Cave Amphipod (Stygobromus pecki) Critical Habitat
The final critical habitat designation included just 38.5 acres (72 Fed. Reg. 39247, July 17, 2007) which is much less than the total extent of habitat identified as essential to the conservation of the species by USFWS scientists. The exclusion of additional acres was not justified under 3(5)(a), 4(b)(2) or any other section of the ESA. It was an arbitrary and capricious decision ordered by Deputy Assistant Secretary Julie MacDonald.

### Comal Springs Riffle beetle (Heterelmis comalensis) Critical Habitat
The final critical habitat designation included just 30.3 acres (72 Fed. Reg. 39247, July 17, 2007) which is much less than the total extent of habitat identified as essential to the conservation of the species by USFWS scientists. The exclusion of additional acres was not justified under 3(5)(a), 4(b)(2) or any other section of the ESA. It was an arbitrary and capricious decision ordered by Deputy Assistant Secretary Julie MacDonald.

### Comal Springs Dryopid Beetle (Stygoparnus comalensis) Critical Habitat
The final critical habitat designation included just 39.5 acres (72 Fed. Reg. 39247, July 17, 2007) which is much less than the total extent of habitat identified as essential to the conservation of the species by USFWS scientists. The exclusion of additional acres was not justified under 3(5)(a), 4(b)(2) or any other section of the ESA. It was an arbitrary and capricious decision ordered by Deputy Assistant Secretary Julie MacDonald.

### Sonoma California Tiger Salamander (Ambystoma californiense) Critical Habitat
The final critical habitat rule in question eliminated critical habitat protection from 74,223 acres to zero acres.  70 Fed. Reg. 74137 (December 14, 2005).   The arbitrary and capricious Section 4(b)(2) exclusions are based on a draft conservation plan, exaggerated negative economic analysis, irrational analysis of impacts on so-called cooperative conservation, and failure to adequately identify the conservation and economic benefits of critical habitat designation.  In

addition, the method to identify areas essential the conservation of the species unlawfully contradicts the best available scientific information.  This rule is illegal.

### *Central California Tiger Salamander (Ambystoma californiense) Critical Habitat*

This final rule reduced critical habitat protection from 399,666 acres to 199,109 acres.  70 Fed. Reg. 49379 (August 23, 2005).  ESA Section 3(5)(A) is, here, misused to exclude areas which the Service believes require no additional conservation action. The Ninth Circuit has established that 3(5)(A) refers to lands which require special management, not additional management.  In addition, the ESA Section 4(b)(2) exclusions are based on the draft conservation plan, exaggerated economic analysis, exaggerated analysis of impacts on cooperation, and failure to adequately identify the conservation and economic benefits of critical habitat designation. Further, the method to identify areas essential to the conservation of the species contradicts the best available scientific information.  This rule is unlawful.

### *Preble's Meadow Jumping Mouse (Zapus hudsonius preblei) Critical Habitat*

The final rule for this species reduced protection from 57,446 acres in the proposed rule to 31,222 acres.  68 Fed. Reg. 37276 (June 23, 2003).   In this instance, ESA Section 3(5)(A) was misused to exclude areas which the Service asserts require no additional conservation action. The Ninth Circuit has established that 3(5)(A) refers to lands which require special management, not additional management. Additionally, many of the plans which supposedly eliminate the need for special management were not finalized at the time of the proposed rule, final rule, or even today. In addition, the Section 4(b)(2) exclusions were based on draft conservation plans, exaggerated economic impact assertions, exaggerated social impact assertions, and failure to adequately identify the conservation and economic benefits of critical habitat designation. Finally, contrary to the best available science, not all areas essential the conservation of the species were included in the proposed or final rules. This final rule is unlawful.

### *Piping Plover (Charadrius melodus) Critical Habitat*

The final rule in question for this migratory bird's wintering habitat was reduced from 2,104,879 acres in the proposed rule to 165,211 acres in the final.  66 Fed. Reg. 36038 (July 10, 2001). The exclusion of Padre Island National Seashore under 4(b)(2) in order to expedite oil and gas development in a National Park is arbitrary and capricious. The benefits of designation were underestimated and the costs exaggerated. There was no rational connection between the analysis and the conclusion. Not all areas essential to the conservation of the species were included.  The definition of "occupied" habitat was arbitrary and capricious, and not based upon the best available science.  No rational connection was established between the Service's definition of "essential habitat" and the recovery needs of the species. The designation contradicts the recovery plans for the species.

### *Pecos Assiminea Snail (Assiminea pecos) Critical Habitat*

The critical habitat rule for this species dramatically reduced acreage protection from 1523 acres to 396.5 acres.  70 Fed. Reg. 46303 (August 9, 2005).  The Bitter Lake National Wildlife Refuge was excluded under 3(5)(A) as not requiring "special management" because it is supposedly currently being adequately managed. The Ninth Circuit has established that this is an illegal use

of 3(5)(A). The very fact that the refuge is managed for the species is proof that the area "may require special management." This final rule is unlawful.

### Koster's Tryonia Snail (Juturnia kosteri) Critical Habitat
The critical habitat rule for this species dramatically eliminated acreage protection from 1127 acres to zero acres. 70 Fed. Reg. 46303 (August 9, 2005). The Bitter Lake National Wildlife Refuge was excluded under 3(5)(A) as not requiring "special management" because it is supposedly currently being adequately managed. The Ninth Circuit has established that this is an illegal use of 3(5)(A). The very fact that the refuge is managed for the species is proof that the area "may require special management." This final rule is unlawful.

### Noel's Amphipod (Gammarus desperatus) Critical Habitat
The critical habitat rule for this species dramatically eliminated acreage protection from 1127 acres to zero acres. 70 Fed. Reg. 46303 (August 9, 2005). The Bitter Lake National Wildlife Refuge was excluded under 3(5)(A) as not requiring "special management" because it is supposedly currently being adequately managed. The Ninth Circuit has established that this is an illegal use of 3(5)(A). The very fact that the refuge is managed for the species is proof that the area "may require special management."

### Roswell Springsnail (Pyrgulopsis roswellensis) Critical Habitat
The critical habitat rule for this species dramatically eliminated acreage protection from 1127 acres to zero acres. 70 Fed. Reg. 46303 (August 9, 2005). The Bitter Lake National Wildlife Refuge was excluded under 3(5)(A) as not requiring "special management" because it is supposedly currently being adequately managed. The Ninth Circuit has established that this is an illegal use of 3(5)(A). The very fact that the refuge is managed for the species is proof that the area "may require special management."

### Helotes Mold Beetle (Batrisodes venyivi) Critical Habitat
The final rule in question was finalized for this Bexar County (TX) karst cave species on April 8, 2003 (68 Fed. Reg. 17155). Although the proposed critical habitat rule sought to protect 958 acres, the final rule shrunk this to just 164 acres. The proposed rule included the surface/subsurface drainage areas and contiguous karst deposit associated with occupied caves to support dominant, subdominant, and rare plant species. The approach sought to protect the lands, vegetation, drainage system, and geological features necessary ensure the ecological integrity of occupied caves. Contrary to the recommendation of U.S. Fish and Wildlife Service scientists, agency bureaucrats ordered the final rule to protect less acreage for native plants and to essentially abandon protection of the drainage area necessary to ensure water quality, chemistry and abundance by dramatically shrinking protection of surface/subsurface areas and contiguous karst deposits. The change was arbitrary, capricious, and in contradiction to the best available scientific information indicating the extent and types of areas necessary for the conservation of the species. The final designation illegally invokes 3(5)(A) and 4(b)(2) to exclude proposed units 1a, 1b, 1c, 1d, 10, and 11. The Secretary asserts the areas do not need additional management changes. 3(5)(A) defines areas as essential to conservation if they need "special management", not "additional" management. As the Ninth Circuit has already

established, the fact that the Secretary asserts that these areas are being specially managed is proof that they qualify as critical habitat, not an argument against it. The Secretary asserts that the cost of designating these areas exceeds the benefit; such judgment can only rationally be rendered if an adequate and consistent account of the cost and benefit has been conducted. Instead, the Secretary has used unsupported speculation to exaggerate the supposed cost and grossly underestimated the benefit. The use of 3(5)(A) and 4(b)(2) is unlawful.

### Robber Baron Cave Spider (Cicurina baronia) Critical Habitat
The final rule in question was finalized for this Bexar County (TX) karst cave species on April 8, 2003 (68 Fed. Reg. 17155). Although the proposed critical habitat rule sought to protect 395 acres, the final rule shrunk this to just 57 acres. The proposed rule included the surface/subsurface drainage areas and contiguous karst deposit associated with occupied caves to support dominant, subdominant, and rare plant species. The approach sought to protect the lands, vegetation, drainage system, and geological features necessary ensure the ecological integrity of occupied caves. Contrary to the recommendation of U.S. Fish and Wildlife Service scientists, agency bureaucrats ordered the final rule to protect less acreage for native plants and to essentially abandon protection of the drainage area necessary to ensure water quality, chemistry and abundance by dramatically shrinking protection of surface/subsurface areas and contiguous karst deposits. The change was arbitrary, capricious, and in contradiction to the best available scientific information indicating the extent and types of areas necessary for the conservation of the species. The final designation illegally invokes 3(5)(A) and 4(b)(2) to exclude proposed units 1a, 1b, 1c, 1d, 10, and 11. The Secretary asserts the areas do not need additional management changes. 3(5)(A) defines areas as essential to conservation if they need "special management", not "additional" management. As the Ninth Circuit has already established, the fact that the Secretary asserts that these areas are being specially managed is proof that they qualify as critical habitat, not an argument against it. The Secretary asserts that the cost of designating these areas exceeds the benefit. Such judgment can only rationally be rendered if an adequate and consistent account of the cost and benefit has been conducted. Instead, the Secretary has used unsupported speculation to exaggerate the supposed cost and grossly underestimated the benefit. The use of 3(5)(A) and 4(b)(2) is unlawful.

### Madla Cave Meshweaver (Cicurina madla) Critical Habitat
The final rule in question was finalized for this Bexar County (TX) karst cave species on April 8, 2003 (68 Fed. Reg. 17155). Although the proposed critical habitat rule sought to protect 1811 acres, the final rule shrunk this to just 201 acres. The proposed rule included the surface/subsurface drainage areas and contiguous karst deposit associated with occupied caves to support dominant, subdominant, and rare plant species. The approach sought to protect the lands, vegetation, drainage system, and geological features necessary ensure the ecological integrity of occupied caves. Contrary to the recommendation of U.S. Fish and Wildlife Service scientists, agency bureaucrats ordered the final rule to protect less acreage for native plants and to essentially abandon protection of the drainage area necessary to ensure water quality, chemistry and abundance by dramatically shrinking protection of surface/subsurface areas and contiguous karst deposits. The change was arbitrary, capricious, and in contradiction to the best available scientific information indicating the extent and types of areas necessary for the

conservation of the species. The final designation illegally invokes 3(5)(A) and 4(b)(2) to exclude proposed units 1a, 1b, 1c, 1d, 10, and 11. The Secretary asserts the areas do not need additional management changes. 3(5)(A) defines areas as essential to conservation if they need "special management", not "additional" management. As the Ninth Circuit has already established, the fact that the Secretary asserts that these areas are being specially managed is proof that they qualify as critical habitat, not an argument against it. The Secretary asserts that the cost of designating these areas exceeds the benefit. Such judgment can only rationally be rendered if an adequate and consistent account of the cost and benefit has been conducted. Instead, the Secretary has used unsupported speculation to exaggerate the supposed cost and grossly underestimated the benefit. The use of 3(5)(A) and 4(b)(2) is unlawful.

### Braken Bat Cave Meshweaver (Cicurina venii) Critical Habitat

The final rule in question was finalized for this Bexar County (TX) karst cave species on April 8, 2003 (68 Fed. Reg. 17155). Although the proposed critical habitat rule sought to protect 481 acres, the final rule shrunk this to just 85 acres. The proposed rule included the surface/subsurface drainage areas and contiguous karst deposit associated with occupied caves to support dominant, subdominant, and rare plant species. The approach sought to protect the lands, vegetation, drainage system, and geological features necessary ensure the ecological integrity of occupied caves. Contrary to the recommendation of U.S. Fish and Wildlife Service scientists, agency bureaucrats ordered the final rule to protect less acreage for native plants and to essentially abandon protection of the drainage area necessary to ensure water quality, chemistry and abundance by dramatically shrinking protection of surface/subsurface areas and contiguous karst deposits. The change was arbitrary, capricious and in contradiction to the best available scientific information indicating the extent and types of areas necessary for the conservation of the species. The final designation illegally invokes 3(5)(A) and 4(b)(2) to exclude proposed units 1a, 1b, 1c, 1d, 10, and 11. The Secretary asserts the areas do not need additional management changes. 3(5)(A) defines areas as essential to conservation if they need "special management", not "additional" management. As the Ninth Circuit has already established, the fact that the Secretary asserts that these areas are being specially managed is proof that they qualify as critical habitat, not an argument against it. The Secretary asserts that the cost of designating these areas exceeds the benefit. Such judgment can only rationally be rendered if an adequate and consistent account of the cost and benefit has been conducted. Instead, the Secretary has used unsupported speculation to exaggerate the supposed cost and grossly underestimated the benefit. The use of 3(5)(A) and 4(b)(2) is illegal.

### Government Canyon Bat Cave Meshweaver (Cicurina vespera) Critical Habitat

The final rule in question was finalized for this Bexar County (TX) karst cave species on April 8, 2003 (68 Fed. Reg. 17155). Although the proposed critical habitat rule sought to protect 116 acres, the final rule eliminated all critical habitat and protected zero acres. The proposed rule included the surface/subsurface drainage areas and contiguous karst deposit associated with occupied caves to support dominant, subdominant, and rare plant species. The approach sought to protect the lands, vegetation, drainage system, and geological features necessary ensure the ecological integrity of occupied caves. Contrary to the recommendation of U.S. Fish and Wildlife Service scientists, agency bureaucrats ordered the final rule to protect less acreage for

native plants and to essentially abandon protection of the drainage area necessary to ensure water quality, chemistry and abundance by dramatically shrinking protection of surface/subsurface areas and contiguous karst deposits. The change was arbitrary, capricious, and in contradiction to the best available scientific information indicating the extent and types of areas necessary for the conservation of the species. The final designation illegally invokes 3(5)(A) and 4(b)(2) to exclude proposed units 1a, 1b, 1c, 1d, 10, and 11. The Secretary asserts the areas do not need additional management changes. 3(5)(A) defines areas as essential to conservation if they need "special management", not "additional" management. As the Ninth Circuit has already established, the fact that the Secretary asserts that these areas are being specially managed is proof that they qualify as critical habitat, not an argument against it. The Secretary asserts that the cost of designating these areas exceeds the benefit. Such judgment can only rationally be rendered if an adequate and consistent account of the cost and benefit has been conducted. Instead, the Secretary has used unsupported speculation to exaggerate the supposed cost and grossly underestimated the benefit. The use of 3(5)(A) and 4(b)(2) is unlawful.

### Government Canyon Bat Cave Spider (Neoleptoneta microps) Critical Habitat

The final rule in question was finalized for this Bexar County (TX) karst cave species on April 8, 2003 (68 Fed. Reg. 17155). Although the proposed critical habitat rule sought to protect 304 acres, the final rule eliminated all critical habitat and protects zero acres. The proposed rule included the surface/subsurface drainage areas and contiguous karst deposit associated with occupied caves and a minimum of 90 acres, where possible, to support dominant, subdominant, and rare plant species. The approach sought to protect the lands, vegetation, drainage system, and geological features necessary ensure the ecological integrity of occupied caves. Contrary to the recommendation of U.S. Fish and Wildlife Service scientists, agency bureaucrats ordered the final rule to protect only 40 acres for native plants and to essentially abandon protection of the drainage area necessary to ensure water quality, chemistry and abundance by dramatically shrinking protection of surface/subsurface areas and contiguous karst deposits. The change was arbitrary, capricious, and in contradiction to the best available scientific information indicating the extent and types of areas necessary for the conservation of the species. The final designation illegally invokes 3(5)(A) and 4(b)(2) to exclude proposed units 1a, 1b, 1c, 1d, 10, and 11. The Secretary asserts the areas do not need additional management changes. 3(5)(A) defines areas as essential to conservation if they need "special management", not "additional" management. As the Ninth Circuit has already established, the fact that the Secretary asserts that these areas are being specially managed is proof that they qualify as critical habitat, not an argument against it. The Secretary asserts that the cost of designating these areas exceeds the benefit. Such judgment can only rationally be rendered if an adequate and consistent account of the cost and benefit has been conducted. Instead, the Secretary has used unsupported speculation to exaggerate the supposed cost and grossly underestimated the benefit. The use of 3(5)(A) and 4(b)(2) is unlawful.

### Rhadine Infernalis Ground Beetle (Rhadine exilis) Critical Habitat

The final rule in question was finalized for this Bexar County (TX) karst cave species on April 8, 2003 (68 Fed. Reg. 17155). Although the proposed critical habitat rule sought to protect 7557 acres, the final rule shrunk this to just 644 acres. The proposed rule included the

surface/subsurface drainage areas and contiguous karst deposit associated with occupied caves to support dominant, subdominant, and rare plant species. The approach sought to protect the lands, vegetation, drainage system, and geological features necessary ensure the ecological integrity of occupied caves. Contrary to the recommendation of U.S. Fish and Wildlife Service scientists, agency bureaucrats ordered the final rule to protect less acreage for native plants and to essentially abandon protection of the drainage area necessary to ensure water quality, chemistry and abundance by dramatically shrinking protection of surface/subsurface areas and contiguous karst deposits. The change was arbitrary, capricious, and in contradiction to the best available scientific information indicating the extent and types of areas necessary for the conservation of the species. The final designation illegally invokes 3(5)(A) and 4(b)(2) to exclude proposed units 1a, 1b, 1c, 1d, 10, and 11. The Secretary asserts the areas do not need additional management changes. 3(5)(A) defines areas as essential to conservation if they need "special management", not "additional" management. As the Ninth Circuit has already established, the fact that the Secretary asserts that these areas are being specially managed is proof that they qualify as critical habitat, not an argument against it. The Secretary asserts that the cost of designating these areas exceeds the benefit. Such judgment can only rationally be rendered if an adequate and consistent account of the cost and benefit has been conducted. Instead, the Secretary has used unsupported speculation to exaggerate the supposed cost and grossly underestimated the benefit. The use of 3(5)(A) and 4(b)(2) is unlawful.

### *Rhadine Infernalis Ground Beetle Critical Habita (Rhadine Infernalis)*

The final rule in question was finalized for this Bexar County (TX) karst cave species on April 8, 2003 (68 Fed. Reg. 17155). Although the proposed critical habitat rule sought to protect 5083 acres, the final rule shrunk this to just 686 acres. The proposed rule included the surface/subsurface drainage areas and contiguous karst deposit associated with occupied caves to support dominant, subdominant, and rare plant species. The approach sought to protect the lands, vegetation, drainage system, and geological features necessary ensure the ecological integrity of occupied caves. Contrary to the recommendation of U.S. Fish and Wildlife Service scientists, agency bureaucrats ordered the final rule to protect less acreage for native plants and to essentially abandon protection of the drainage area necessary to ensure water quality, chemistry and abundance by dramatically shrinking protection of surface/subsurface areas and contiguous karst deposits. The change was arbitrary, capricious, and in contradiction with the best available scientific information indicating the extent and types of areas necessary for the conservation of the species. The final designation illegally invokes 3(5)(A) and 4(b)(2) to exclude proposed units 1a, 1b, 1c, 1d, 10, and 11. The Secretary asserts the areas do not need additional management changes. 3(5)(A) defines areas as essential to conservation if they need "special management", not "additional" management. As the Ninth Circuit has already established, the fact that the Secretary asserts that these areas are being specially managed is proof that they qualify as critical habitat, not an argument against it. The Secretary asserts that the cost of designating these areas exceeds the benefit. Such judgment can only rationally be rendered if an adequate and consistent account of the cost and benefit has been conducted. Instead, the Secretary has used unsupported speculation to exaggerate the supposed cost and grossly underestimated the benefit. The use of 3(5)(A) and 4(b)(2) is unlawful.

***Cokendolpher Cave Harvestman (Texella cokendolpheri) Critical Habitat***
The final rule in question was finalized for this Bexar County (TX) karst cave species on April 8, 2003 (68 Fed. Reg. 17155). Although the proposed critical habitat rule sought to protect 395 acres, the final rule shrunk this to just 57 acres. The proposed rule included the surface/subsurface drainage areas and contiguous karst deposit associated with occupied caves to support dominant, subdominant, and rare plant species. The approach sought to protect the lands, vegetation, drainage system, and geological features necessary ensure the ecological integrity of occupied caves. Contrary to the recommendation of U.S. Fish and Wildlife Service scientists, agency bureaucrats ordered the final rule to protect less acreage for native plants and to essentially abandon protection of the drainage area necessary to ensure water quality, chemistry and abundance by dramatically shrinking protection of surface/subsurface areas and contiguous karst deposits. The change was arbitrary, capricious and in contradiction to the best available scientific information indicating the extent and types of areas necessary for the conservation of the species. The final designation illegally invokes 3(5)(A) and 4(b)(2) to exclude proposed units 1a, 1b, 1c, 1d, 10, and 11. The Secretary asserts the areas do not need additional management changes. 3(5)(A) defines areas as essential to conservation if they need "special management", not "additional" management. As the Ninth Circuit has already established, the fact that the Secretary asserts that these areas are being specially managed is proof that they qualify as critical habitat, not an argument against it. The Secretary asserts that the cost of designating these areas exceeds the benefit. Such judgment can only rationally be rendered if an adequate and consistent account of the cost and benefit has been conducted. Instead, the Secretary has used unsupported speculation to exaggerate the supposed cost and grossly underestimated the benefit. The use of 3(5)(A) and 4(b)(2) is unlawful as is the final rule.

***Thread-leaved Brodiaea (Brodiaea filifolia) Critical Habitat***
The final rule in question for this California plant species was issued on December 13, 2005 (70 Fed. Reg. 73820) and protected just 597 acres of habitat while the proposed rule had sought to protect 4,960 acres. Similar to the cave species, supra, the USFWS violated Section 3(5)(A) by excluding habitat based on the fact that it was already managed on public lands. The USFWS also exaggerated costs and ignored benefits of critical habitat in its Section 4(b)(2) exclusion. The USFWS, additionally, illegally relied upon a draft conservation plan, as well as irrationally ignored and contradicted its peer reviewers by limiting essential habitat to populations of 850 plants or more. Many existing populations of plants were, thus, arbitrarily excluded from habitat protection despite the peer review and despite the recovery mandate of the Act.

***Willowy Monardella (Monardella linoides ssp. viminea) Critical Habitat***
The final rule in question here was finalized for this California species on November 8, 2006 (71 Fed. Reg. 65662) and protected just 73 acres despite the proposed rule's 115 acres and the USFWS' scientific determination that 2539 acres are essential to the plant's conservation. The Section 4(b)(2) exclusion is based on exaggerated costs and a refusal to identify benefits. Further, the Section 4(b)(2) exclusion fails to acknowledge that San Diego MSCP is not based on a recovery or even a benefit standard. Section 4(b)(2) cannot, here, be applied to Department of Interior lands (in this case BLM) because the Secretary has complete control over DOI decisions; it is irrational to assert that in the critical habitat exclusion the Secretary is providing an incentive

to himself by disregarding the Act's conservation mandate. Marine Corps Air Station (MCAS) Miramar's INRMP also does not benefit the species and thus does not qualify for a Section 4 exclusion given the analysis of so-called costs.

### Lane Mountain Milkvetch (Astragalus jaegerianus) Critical Habitat

The final rule for this California plant species was finalized on April 8, 2005 (70 Fed. Reg. 18220) and protected zero acres despite the fact that the proposed rule had identified 29,522 acres as "essential" habitat. The exclusion of all essential Lane Mountain milkvetch habitat under 3(5)(a) and 4(b)(2) is among the Bush administration's most contradictory and incoherent critical habitat decisions. All essential habitat on BLM lands was excluded under 3(5)(a) under the premise that since such lands are already managed for the species, they do not need "additional" management. Even if the lands were being adequately managed, the Ninth Circuit has clearly, and with some hostility toward the DOI, established that this condition precisely requires designation, rather than excludes it. Additionally, the critical habitat rule itself makes clear that the BLM is not managing the habitat under a recovery standard, so there is no factual basis for the assertion of adequacy. The Service's attempt to avoid examining the BLM's failure to manage for recovery by claiming "it is not possible to quantify these benefits at this time" is blatantly illegal. The purpose of a critical habitat decision is exactly to determine such benefits. The Service is clearly aware that its 3(5)(A) exclusion is illegal because immediately after making the exclusion, it states "However, to the extent that these specific areas meet the definition of critical habitat pursuant to section 3(5)(A)(i)(II) of the Act, we are excluding under section 4(b)(2)". The land is either included under 3(5)(A) or it's not. The Service can't claim it is critical habitat, then proceed with an analysis based the fact it isn't. The Service's subsequent 4(b)(2) analysis is arbitrary and capricious for the same reason as its competing 3(5)(A) analysis: the Secretary can't make a rational cost benefits analysis based on an analysis that expressly concedes it has not calculated the recovery benefit; the supposed "benefits of exclusion" analysis does not present any significant benefits and does demonstrate that the benefits of exclusion were actually weighed against the benefit of designation. Further, the exclusion of all essential habitat on Fort Irwin under 4(b)(2) is contradictory, incoherent, arbitrary and capricious. The contradictions are strong indication of political intervention by Department of Interior senior officials. The Service first argues that critical habitat designation will have no benefit on DOD lands because it will not affect DOD operations or change management of milkvetch habitat. Then it concludes that it will cause $10 billion dollars in cost by curtailing DOD operations that the base would have to be closed and a new based established somewhere else. The rule notes that these premises are mutually exclusive (i.e. no impact on DOD v. complete eradication of the base), then concludes "The Service defers to the Army's identification of specific credible military readiness or national security impacts." It is illegal for the Service to explain that the DOD analysis is contradictory to the Service's own analysis, but then conclude that it will accept the analysis anyway. The adoption of two radically incompatible premises renders the 4(b)(2) exclusion arbitrary and capricious. The exclusion of NASA leased land on Fort Irwin under the guise of national security is also arbitrary and capricious. In the first place, space exploration is not a national security program and the Service's description of the NASA activity includes nothing related to national security. Secondly, the Service's analysis concludes that the designation would have very little impact on NASA activities. Thus it replicates the

contradictory logic as the rest of the Fort Irwin exclusions: no benefit because of lack of impact, huge costs because of massive impact. This is arbitrary and capricious. The non-federal lands excluded under 3(5)(A) and 4(b)(2) violate the same legal, economical, and scientific standards as the BLM, Fort Irwin, and NASA exemptions. They exaggerate the costs, underestimate the benefits, and thereby render the exclusion decision arbitrary and capricious.

***Coachella Valley Milkvetch (Astragalus lentiginosus var. coachellae) Critical Habitat***
The final rule in for this California plant species was finalized on December 15, 2005 (70 Fed. Reg. 74111) and protected zero acres of habitat despite the final rule's acknowledgment that 17,746 acres of habitat are essential to its conservation and despite the proposed rule's 3583 acres of potential protected habitat (and 20,559 acres deemed essential). The final decision contradicts the best available scientific information by defining essential habitat in a non-scientific manner, excluding most known milkvetch locations, failing to articulate a relationship between the identified essential areas and recovery objectives for the species, and by contradicting the peer reviewers without a rational explanation of its divergence. This final agency action violates section 3(5)(A) by excluding Bureau of Land Management and National Wildlife Refuge lands on the basis of the assertion that the lands are already managed for the milkvetch. As a matter of law, that fact such lands are managed for the milkvetch is proof they "may require special management." The 4(b)(2) exclusions on private and public lands is arbitrary and capricious because the cost-benefit analysis grossly overestimated costs and severely underestimated benefits. The reliance on a draft HCP is unscientific speculation, as is the presumption that the milkvetch will be protected by actions directed at other species.

***San Jacinto Crownscale (Atriplex coronata var. notatior) Critical Habitat***
The final rule for this California plant species was finalized on October 13, 2005 (70 Fed. Reg. 59952) and protected zero acres despite 15,232 acres determined to be essential and an earlier proposed rule that sought to protect 3845 acres. The San Jacinto crownscale is restricted to the San Jacinto, Perris, Menifee and Elsinore Valleys of western Riverside County, California; primarily the San Jacinto River, Upper Salt Creek, and Alberhill Creek. It declined by 70% between 1992 and 1998, and 50% between its 1994 listing proposal and 1999, due to habitat destruction and conversion (63 Fed. Reg. 54975). Oddly, the 1994 critical habitat proposal was withdrawn in the 1998 listing rule "based on the plant's continued decline, by perhaps 50 percent, since its listing was proposed...Repeated discing of significant areas of habitat occupied by this plant, including proposed critical habitat, is likely to have contributed to the decline...This decline occurred despite the proposal of critical habitat, so the proposal's map evidently provided no conservation benefit with respect to notification of government agencies and others...The identification of critical habitat would not increase management or conservation efforts on State or private lands and could impair those efforts. The Service believes that conservation of this species on private lands can best be addressed by working directly with landowners and communities during the recovery planning process and through the interagency coordination and consultation processes of section 7 should there be any future unforeseen federal involvement." In other words, the purposeful destruction of essential habitat, which was allowed by the Service's failure to complete the critical habitat designation and listing, is judged to be evidence that the species habitat should not be protected. The Center sued over the refusal to protect the

crownscale's habitat (*CBD et al.* v. *Norton,* No. 01–CV–2101 (S.D. Cal.)),  obtaining a court order on July 1, 2002 requiring the U.S. Fish and Wildlife Service to issue a new critical habitat decision. On October 7, 2004, the agency identified 15,232 acres of essential habitat for the crownscale, but proposed to exclude all of it from critical habitat designation under 4(b)(2). Despite opposition by scientists, all three of the agency's scientific peer reviewers, and conservationists, the agency finalized the decision now challenged. The 4(b)(2) exclusions was based on a wildly exaggerated estimate of the economic and social costs, and a refusal to identify the full economic and conservation benefits. Thus exclusion, therefore, did not and cannot demonstrate a rational connection between the exclusion and the benefits that will supposedly accrue form it. The entire process, and final action, was arbitrary and capricious.

### Riverside Fairy Shrimp (Streptocephalus woottoni) Critical Habitat

The final rule in question was finalized on April 12, 2005 (70 Fed. Reg. 19153) and protects just 306 acres despite earlier proposed and final rules that protected anywhere from 5795 acres to 12060 acres.  The final revised designation fails to employ the best scientific data and information available. Even before application of its exclusions, the final rule fails to identify all areas essential the conservation of the species.  Without rational explanation, or even acknowledgement, it contradicts the Riverside fairy shrimp's recovery plan, scientific peer reviewers, and U.S. Fish and Wildlife Service scientists. It falsely identifies many essential habitat areas as not essential. The 4(B)(2) analysis exaggerates the economic and other costs, while underestimating the benefits, thereby rendering the 4(B)(2) exclusions arbitrary and capricious. The 3(5)(A) analysis erroneously describes existing conservation plans, illegally relies on draft plans, and illegally concludes that the existence of conservation plans indicates that "special management" is not necessary.

### Quino Checkerspot Butterfly (Euphydryas editha quino) Critical Habitat

The final rule in question was finalized on April 15, 2002 (67 Fed. Reg. 18355) and protects 171,605 acres of critical habitat compared to the 301,010 acres proposed for protection. The final designation contradicts the concurrently developed recovery plan without explanation or acknowledgement. The final designation fails to either designate or exclude areas known to be essential to the species (e.g. the Dulzura Occurrence Complex). Contrary to its stated methodology, the designation fails to determine whether all areas occupied by butterflies during the 2001 adult flight season were essential or not. The 4(b)(2) analysis exaggerates the economic and other costs, while underestimating the benefits, thereby rendering the 4(b)(2) exclusions arbitrary and capricious. The 3(5)(A) analysis erroneously describes existing conservation plans, illegally relies on draft plans, and illegally concludes that the existence of conservation plans indicates that "special management" is not necessary.  This final rule is unlawful.

### Santa Cruz Tarplant (Holocarpha macradenia) Critical Habitat

The final rule in question was finalized on October 16, 2002 (67 Fed. Reg. 63967) and protects 2,902 acres of critical habitat while the proposed rule sought to protect 3,360 acres.  The final rule neither designates nor excludes areas known to be essential to the species' conservation, and is accordingly unlawful.

*Robust Spineflower (Chorizanthe robusta var. robusta) Critical Habitat*
The final rule in question was finalized on May 28, 2002 (67 Fed. Reg. 36822) and protects 469 acres of critical habitat, while the proposed rule sought to protect 1945 acres.  The final designation fails to either designate or exclude areas "occupied" and areas likely to be essential to the species. Contrary to its own methodology, the designation fails to determine whether certain occupied areas are essential to the recovery of the species. The designation violates its own definition of "occupied" to avoid designation of certain areas. Without explanation or acknowledgement, the designation contradicts the USFWS draft recovery plan and recommendations by peer reviewers.  This final rule is unlawful.

*Monterey Spineflower (Chorizanthe pungens var. pungens) Critical Habitat*
The final rule in question was finalized on May 29, 2002 (67 Fed. Reg. 37498) and protected 18,830 acres of habitat while the proposed rule sought to protect 25,800 acres of habitat.  The final designation fails to either designate or exclude areas "occupied" and areas likely to be essential to the species. Contrary to its own methodology, the designation fails to determine whether certain occupied areas are essential to the recovery of the species. The Section 4(b)(2) analysis exaggerates the economic and other costs, while underestimating the benefits, thereby rendering the 4(b)(2) exclusions arbitrary and capricious. The Section 3(5)(A) analysis erroneously describes existing conservation plans, illegally relies on draft plans, and unlawfully concludes that the existence of conservation plans indicates that "special management" is not necessary. The designation contradicts the USFWS recovery plan and recommendations by peer reviewers. This final agency action is contrary to law.

*Spreading Navarretia (Navarretia fossalis) Critical Habitat*
The final rule in question was finalized on October 18, 2005 (70 Fed. Reg. 60657) and protects 652 acres of critical habitat while the proposed rule sought to protect 4301 acres and identified 31,086 acres as essential to the species' conservation.  The Section 4(b)(2) analysis exaggerates the economic and other costs, while underestimating the benefits, thereby rendering the 4(b)(2) exclusions arbitrary and capricious. The Section 3(5)(A) analysis erroneously describes existing conservation plans, illegally relies on draft plans, and illegally concludes that the existence of conservation plans indicates that "special management" is not necessary. The designation contradicts the USFWS recovery plan and recommendations by peer reviewers.  This final agency action is illegal.

*Munz's onion (Allium munzii) Critical Habitat*
The final critical habitat designation rule identified 1,244 acres of habitat essential to the conservation of Munz's onion, but designated just 176 acres (70 Fed. Reg. 33015).  The designation is limited to the least threatened lands within the range of the species-- Elsinore Peak in the Cleveland National Forest which is protected by the *Allium munzii* Species Management Guide—but excludes the most threatened lands--1,068 acres within the Western Riverside County MSHCP, the Rancho Bella Vista HCP, and the Long-Term Stephen's Kangaroo Rat HCP. The Section 4(b)(2) analysis exaggerates the economic and other costs, underestimates the benefits, fails to acknowledge that the HPCs provide a lesser level of protection than the critical habitat conservation standard. The exclusions, therefore are arbitrary and capricious.

Additionally, the designation failed to include areas recommended by its chosen peer reviewers without giving a scientific rationale.

Thank you for your prompt consideration of the legal defects and serious violations identified in this letter (including the many deficient Section 7 consultations caused by these illegal actions). To repeat, we stand ready to help good faith implementation of the law if the Department of Interior is truly interested in charting a more productive course than has been pursued since 2001. However, these identified illegal agency actions must be remedied.


Sincerely,


William J. Snape, III
Senior Counsel
Center for Biological Diversity
5268 Watson Street, NW
Washington, DC 20016
202-536-9351
bsnape@biologicaldiversity.org

# Exhibit B



# United States Department of the Interior

FISH AND WILDLIFE SERVICE

California/Nevada Operations Office
2800 Cottage Way, Suite W-2606
Sacramento, CA 95825



JUN 2 9 2007

To:  Director

From:  Manager, California-Nevada Operations Office

Subject:  Review of Service Decisions under the Endangered Species Act Involving the Deputy
Assistant Secretary, Fish, Wildlife, and Parks, in California and Nevada, 2001 - 2006

On May 17, 2007, you asked CNO Ecological Services (ES) project leaders to evaluate the involvement
of the Deputy Assistant Secretary, Fish, Wildlife, and Parks (DAS) in the important Endangered Species
Act (Act) decisions made by the Service in CNO during the years 2001 through 2006. Specifically, you
asked us to evaluate past Service decisions to determine if the DAS, in her oversight capacity as a high-
ranking Departmental official, influenced or modified our position on the scientific basis for our final
actions or decisions.

This request was discussed with CNO regional staff and field office project leaders (PLs). The Assistant
Manager (AM) had follow up conference calls with PLs on May 31, 2007, and on June 6, 2007, and he
received responses from all CNO ES field stations. This memorandum summarizes the results of this
review, and the source documents are on file in CNO.

Summary of Findings and Recommendations

Consistent with the findings of the Inspector General, we found that the DAS did actively attempt to
influence our scientific rationale and conclusions on multiple occasions. But we found in the majority
of cases that the DAS input did not lead to inappropriate changes to our scientific conclusions or
recommendations. We made the following specific findings and recommendations:

- The DAS influenced the application of science in the following critical habitat rules: arroyo toad
  and California red-legged frog. *We recommend reevaluating arroyo toad and California red-
  legged frog critical habitat designations as appropriate.*
- The DAS may have influenced the application of science in the bull trout and southwestern
  willow flycatcher critical habitat rules. *We recommend coordinating with Regions 1 and 6 on
  bull trout critical habitat, and with Region 2 on southwestern willow flycatcher critical habitat,
  to make a determination if revisiting CH is necessary and appropriate for these species.*
- The DAS was heavily engaged in two biological opinion processes at the Carlsbad Fish and
  Wildlife Office (CFWO) in 2001-2003. Although she intervened from the perspective of the
  applicant to reduce the level of impact avoidance or conservation ultimately required as part of

1

the action, she did not unduly influence the final biological opinion of the Service. *Therefore, we do not recommend revisiting these biological opinions.*

In contrast to her involvement in scientific issues, the DAS's involvement did lead to many changes in draft critical habitat rules due to her application of Department policies and Secretarial discretion, especially section 3(5)(a) and 4(b)(2) exclusions and interpretations of statute language (e.g., "occupied at the time of listing"). However, the Service conducted the statutorily required "extinction analysis" for any critical habitat rules that contained such exclusions, and all were found to be consistent with the requirements of the Act.

It is our understanding that these exclusion policies and other interpretations are, for the most part, still current policy within the Department. Therefore, we do not recommend revisiting any of these critical habitat decisions unless the Department formally revises these policy positions and directs us to reevaluate previously completed critical habitat rules.

Conclusion

As the above summary indicated, we believe it is necessary to distinguish between Service work products that may have been influenced by the DAS due to her scientific opinion on a particular issue, compared to those Service work products that were changed due to the DAS's interpretation of policy or statute. Our review revealed that Service employees did a good job in considering the DAS's scientific, legal, and policy input during the rule-making and biological opinion processes. With the few exceptions noted above, the vast majority of any modifications made to Service work products were made as a consequence of the Department's policy discretion and not as a result of the Service deferring to the scientific opinion of the DAS.

Thank you for the opportunity to conduct this review.

2

Exhibit C



# United States Department of the Interior

FISH AND WILDLIFE SERVICE
Washington, D.C. 20240



In Reply Refer To:
FWS/AEA/033829

NOV 2 3 2007

The Honorable Nick J. Rahall, II
Chairman
Committee on Natural Resources
House of Representatives
Washington, D.C. 20515

Dear Mr. Chairman:

Thank you for your interest in the U.S. Fish and Wildlife Service's (Service) review of certain
Endangered Species Act (ESA) decisions overseen by former Deputy Assistant Secretary Julie
MacDonald. As you know, on July 20, 2007, the Service announced that it would review eight
ESA decisions that may have been inappropriately influenced by the Deputy Assistant Secretary.
This review was undertaken after questions were raised about the integrity of scientific
information used and whether the decisions made were consistent with the appropriate legal
standards.

The Service has completed its review of these eight decisions under the ESA. Based upon our
review, the Service has determined that revisions should be made for the following species:

### White-tailed prairie dog 90-day finding

After review of the 90-day finding which determined that the petition did not contain substantial
information indicating that listing may be warranted, the Service believes that this decision
should be reconsidered. Consequently, the Service will complete a 12-month finding in fiscal
year 2009, if funding is available.

### Canada lynx final critical habitat

Consistent with a declaration filed with the Federal District Court of the District of Columbia,
the Service will complete a new proposed rule designating critical habitat for the Canada lynx by
August 2008. Beginning on February 1, 2008, the Service is required to provide status reports to
the court on our progress.

### Preble's meadow jumping mouse proposed delisting

On November 1, the Service announced that it would withdraw its proposed delisting rule for the
Preble's meadow jumping mouse. The Service's proposed rule to amend the Preble's meadow
jumping mouse listing and to specify over which portion the subspecies is threatened was
published on November 7, 2007. The Service anticipates that a final listing rule will publish in
June 2008.



The Honorable Nick J. Rahall, II                                                    2

Preble's meadow jumping mouse critical habitat
Once a final listing rule is issued, we anticipate reviewing the final critical habitat designation and, if necessary, proceeding with a revision when funding is available.

Hawaiian picture-wing flies critical habitat
The Service has completed a rule to re-propose critical habitat for 12 species of picture-wing flies. The new proposed rule has been delivered to the Federal Register.

Arroyo toad critical habitat
The Service believes that the final critical habitat designation should be revised. We will proceed with this revision as funding is made available.

California red-legged frog critical habitat
The Service believes that the final critical habitat designation should be revised. We will proceed with this revision as funding is made available.

The Service believes that revising the seven identified decisions is supported by scientific evidence and the proper legal standards. As resources allow, these revisions will be completed as expeditiously as possible.

With respect to the Southwestern willow flycatcher, after coordinating among the Service's offices in Regions 2, 6, and California-Nevada Operations, the Service does not recommend revision of the final critical habitat designation. We believe that the 29 kilometer radius used to measure the range of the flycatcher movements and its site connectivity is scientifically supportable.

We appreciate your continued interest in the administration of the Endangered Species Act. If you have further concerns or questions, please do not hesitate to contact me directly at (202) 208-4545.

Sincerely,

Kennith Stansell

**Acting** DIRECTOR